UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.:

AT LAW AND IN ADMIRALTY

DIANE BRADBURY,

      Plaintiff

v.

NCL (BAHAMAS) LTD, A BERMUDA
CORPORATION, d/b/a NORWEGIAN
CRUISE LINE,
DR. GIA ADAMIA,
DR. FRANCISCO PERRILLIAT NAVA,

      Defendants.

_____/

## COMPLAINT FOR DAMAGES

The Plaintiff, DIANE BRADBURY, hereby sues Defendants, and alleges as follows:

1.      This is an action for damages in excess of $75,000, exclusive of interest, costs, and attorney's fees.

2.      **THE PLAINTIFF.**

      a.      **BRADBURY** is sui juris and a resident and citizen of Amesbury, Massachusetts. At all times material hereto, Bradbury was a passenger onboard the cruise ship NCL *Gem* operated by the defendant cruise line. At all times material hereto, Bradbury received medical care and treatment from the defendant physicians and medical staff onboard the ship.

3.      **THE DEFENDANTS**.

      a.      **NCL (BAHAMAS) LTD., A BERMUDA CORPORATION, d/b/a NORWEGIAN CRUISE LINE** The Defendant, NCL (BAHAMAS) LTD., A BERMUDA CORPORATION, d/b/a NORWEGIAN CRUISE LINE (Hereinafter referred to as "NCL") is a

1

foreign corporation incorporated in Bermuda and is doing business in Miami Dade County, Florida. The Defendant is a citizen of Florida for purposes of diversity of citizenship under 28 U.S.C. § 1332. At all times material hereto, the Defendant owned and/or operated the ship on which the subject incident occurred.

       b.      **DR. GIA ADAMIA** ("Dr. Adamia" and, together with Dr. Perrilliat Nava, the "Defendant Doctors"), is a physician licensed outside the state of Florida. At all times material hereto, Dr. Adamia was an employee, agent, and/or apparent agent of NCL. At all times material hereto, Dr. Adamia worked as one of the shipboard physicians on the cruise ship owned and/or operated by NCL on which the subject negligence occurred, and provided negligent medical care to Bradbury, which caused permanent injury to Bradbury.

       c.      **DR. FRANCISCO PERRILLIAT NAVA** ("Dr. Perrilliat Nava" and, together with Dr. Adamia, the "Defendant Doctors"), is a physician licensed outside the state of Florida. At all times material hereto, Dr. Perrilliat Nava was an employee, agent, and/or apparent agent of NCL. At all times material hereto, Dr. Perrilliat Nava worked as one of the shipboard physicians on the cruise ship owned and/or operated by NCL on which the subject negligence occurred, and provided negligent medical care to Bradbury, which caused permanent injury to Bradbury.

    4.      **FEDERAL SUBJECT MATTER JURISDICTION**. Federal subject matter jurisdiction arises under 28 U.S.C. § 1332, as this is a civil action where the matter in controversy exceeds $75,000 exclusive of interest and costs, and is between citizens of different States and/or citizens of a State and citizens of a foreign state. This action also arises under and is by virtue of the admiralty or maritime jurisdiction pursuant to 28 U.S.C. § 1333.

    5.      **PERSONAL JURISDICTION AND VENUE**. NCL, at all times material hereto, through agents or representatives, in the District in which this Complaint is filed:

2

     a.  Operated, conducted, engaged in, or carried on a business venture in this state and/or county;

     b.  Had an office or agency in this state and/or county;

     c.  Engaged in substantial activity within this state; and/or

     d.  Committed one or more of the acts stated in Florida Statutes, Sections 48.081, 48.181, or 48.193.

Further, this action is being filed in federal court in Miami-Dade County, Florida, as required by the venue selection clause in the Passenger Ticket Contract issued by NCL.

6.     All conditions precedent for filing and maintaining this action have been fulfilled, have been waived, or do not apply.

7.     **DATE OF THE INCIDENTS**. The incidents giving rise to this action occurred between November 8, 2019 and November 10, 2019.

8.     **LOCATION OF THE INCIDENTS.** The incidents occurred onboard the vessel NCL *Gem*, a ship in navigable waters while Bradbury was a passenger onboard. Accordingly, Plaintiff's claims are governed by general maritime law.

9.     **STATUS OF PLAINTIFF AS OF DATE AND TIME OF THE INCIDENT.** At all times material hereto, Plaintiff was a passenger on the subject cruise ship described herein and, accordingly, was an invitee while on the vessel.

10.     **DUTY OWED.** NCL owes its passengers a duty of reasonable care under the circumstances. The scope of NCL's duty is informed by the facts and circumstances, including NCL's voluntary undertaking to provide medical care to its passengers and its representations to its passengers concerning same. NCL's duty of care in this case includes the duty to provide prompt and appropriate medical care to its passengers, including Plaintiff.

## NCL'S VOLUNTARY UNDERTAKING TO PROVIDE MEDICAL CARE TO ITS PASSENGERS AND ITS REPRESENTATIONS TO THE PUBLIC REGARDING SAME

11.     NCL deliberately chose to enter the business of medicine by providing medical services to its passengers and crew members aboard its ships. NCL reaps the tangible benefits from providing such services as part of its business strategy. NCL's voluntary undertaking to provide medical care to its passengers is evidenced by, *inter alia*, the fact that:

a.     NCL caters to U.S. citizens who are accustomed to and expect first-world medical care, knowing that its cruises, including the subject cruise, are on the open seas for extended periods of time, and thus the only medical care reasonably available to the passenger is onboard the ship.

b.     NCL profits from providing onboard medical care to its passengers. NCL markets to the general public that the cruise line provides medical care for its passengers onboard its ships. NCL derives revenue from its medical center by charging the passengers onboard for the provided by the cruise line.

c.     NCL markets its cruises as safe and secure—as demonstrated by the representations discussed below—even though it regularly takes its passengers to the waters offshore of developing countries where the medical care is below the standard of medical care available in the United States and developed countries.

12.     NCL represents in its marketing materials that "[a] physician and nurse are on each ship to provide medical care and services," with the intent that passengers will rely on these representations.

13.     NCL also represents in its passenger bill of rights that passengers have:

1.  The right to disembark a docked ship if essential provisions such as food, water, restroom facilities and access to medical care cannot adequately be provided onboard, subject only to the Master's concern for passenger safety and security and customs and immigration requirements of the port.

5.   The right to a ship crew that is properly trained in emergency and evacuation procedures.

14.   NCL also represents that it investigates the education, licensing, and training of its shipboard doctors and medical staff prior to selecting and hiring them to serve aboard its ships. NCL further represents that it ensures that, prior to serving aboard NCL ships, its doctors and medical staff receive additional training in handling life-threatening medical emergencies. NCL represents that its shipboard medical centers are equipped with medications and equipment needed to render appropriate treatment to passengers suffering life-threatening medical emergencies.

15.   NCL also represents to its passengers that it has the capability to medically evacuate gravely ill or injured passengers from the ship while it is still at sea and/or divert the ship's course to expedite provision of appropriate emergency medical treatment.

16.   NCL also makes representations in its marketing materials, online, and in its onboard video about the ease of travel for its primarily U.S. citizen passengers. Thus, even though NCL ships regularly travel to ports in developing countries and in areas that have suffered significant damage due to natural disasters such as hurricanes and earthquakes, NCL represents that its medical centers are staffed by qualified physicians and nurses capable of providing the highest quality of medical care to its passengers.

17.   NCL makes the above representations to induce prospective passengers to purchase NCL cruises, even though those cruises travel to developing countries, with sub-standard medical care, and to isolated waters of the world.

18.   These representations form part of the basis for NCL's duty to provide medical care of a certain quality and capability onboard its ships.

19.   Relying on NCL's representations about the medical facilities and amenities aboard its cruise ships, Bradbury boarded the NCL *Gem* for a cruise that departed on November 8, 2019.

20.     Bradbury boarded the *Gem* on November 8, 2019, which was the first day of her cruise.  The NCL *Gem* departed from Boston, Massachusetts.

21.     On November 8, 2019 at approximately 7:30 p.m. Bradbury fell and smashed her head on an interior deck staircase leading between the 7th and 6th.  The fall and impact on Bradbury's head caused her to lose consciousness.

22.     Bradbury's wife Pam Kus did not see Bradbury fall however she heard Bradbury fall and turned around.  Bradbury was unconscious, non-responsive, and her eyes were fluttering.

23.     Several NCL personnel responding to the scene of the incident while Bradbury remained on the floor.  These crew members included upper management who made several calls on their NCL assigned cell phones regarding this incident.  NCL medical personnel responded to the scene of the incident.  NCL's medical personnel were advised that Bradbury fell, lost consciousness and needed medical care and treatment.

24.     At the time NCL responded to the scene of the incident with Bradbury on the floor the NCL *Gem* was sailing just off the port of Boston, Massachusetts.

25.     NCL's personnel had to assist Bradbury to get up from the floor and into a wheelchair.  NCL took Bradbury to the shipboard medical center.  Kus reported to NCL's personnel and medical personnel that after Bradbury's fall that she lost consciousness, was non-responsive and her eyes were fluttering as a result of this fall.  Despite being told about the severity of Bradbury's fall, observing Bradbury unresponsive, and/or confused, NCL did chose not to medically disembark Bradbury for a CT scan and/or further medical treatment and/or arrange for transport for Bradbury to an appropriate hospital in Boston, Massachusetts.  While NCL *Gem* ship was still in close range of the Port of Boston NCL failed to advise plaintiff to disembark the ship immediately and to seek emergency medical care and failed to arrange for immediate

disembarkation and emergency transport to a hospital or medical center with a CT scan and emergency trauma capabilities many of which are located in the greater Boston area.

26.     Bradbury reported to NCL's medical personnel that she was embarrassed and was just fine.  NCL relied on Bradbury, minutes after losing consciousness from smashing her head, to appropriately and reasonably make a medical decision and/or choices about her care and treatment. Bradbury asked to leave the medical center and went to her cabin.  At no point of time did NCL's shipboard doctor and/or medical personnel advise or recommend that Bradbury disembark the vessel while it was in close range of the port of Boston for a CT scan and/or medical treatment. NCL also chose not to arrange for Bradbury's medical disembark despite knowing Bradbury had just suffered significant head trauma and lost consciousness.  Instead NCL's medical personnel and staff allowed Bradbury to leave without any warnings about a possible brain bleed and/or other brain injury; without any recommendation to disembark for appropriate care and treatment; without arranging for a medical disembark and/or transport; and without medically evaluating Bradbury's condition.

27.     Once at her cabin, Bradbury complained of having a headache and feeling nauseated.  The next day Bradbury continued to suffer from headaches and felt nauseated.

28.     During her fall, Bradbury did hit her head and she developed a bump on the back-right side of her head (right occiput).

29.     By the morning of November 10, 2019 Bradbury was sitting with Kus and started to become confused.  Kus attempted to do a crossword puzzle with Bradbury who was unable to answer questions.  Growing increasingly concerned, Kus asked Bradbury simple questions such as do you know where we are to which Bradbury could not provide appropriate responses.

30.     Kus took Bradbury went to the ship's medical center, where she was evaluated and treated by NCL's medical personnel, including Dr. Adamia and later by Dr. Perrilliat Nava.

31.     By this time, Bradbury's bump on her head progressed to the size of two eggs together.  NCL's medical personnel asked Bradbury if she knew where she was.  Bradbury could only respond "you know".  Bradbury could not answer NCL's medical personnel's questions.  At the time, NCL's medical personnel was aware that approximately 36 hours earlier Bradbury fell and hit her head.  NCL's medical personnel told Kus that Bradbury had to stay in the medical center.

32.     Kus briefly left Bradbury to seek assistance from NCL's medical personnel.  When Kus returned she found Bradbury standing next to the medical bed urinating on the floor without any idea where she was.

33.     NCL's doctor did not tell Kus that Bradbury was suffering from a medical emergency.  However, suspecting that this was not true, Kus called her family, who confirmed that Bradbury was suffering from a progressive, time sensitive medical emergency.

34.     NCL's doctor and/or shipboard medical personnel did not prescribe that Bradbury undergo any radiological studies (such as a CT scan or MRI) to determine whether Bradbury was suffering from any subdural injury, such as bleeding on or around the brain.

35.     NCL and NCL's medical personnel knew on November 10, 2019 that it was not scheduled to arrive at its next port until November 12, 2019 at 8:00 a.m.

36.     Despite the limitations of the ship's medical center, NCL's doctors did not take steps to arrange and/or demand for an immediate medical evacuation for Bradbury to a shoreside medical facility where Bradbury could undergo additional radiological studies and receive advanced treatment that was not available aboard the ship.

37.     Instead, NCL's medical personnel and doctors waited for hours and did not know and/or was unsure of the appropriate next steps for Bradbury's care and treatment or even her

diagnosis.  NCL therefore blew further opportunities and made wrong choices by not evacuating at other times after the ship left Boston.

38.     NCL's shipboard doctor, Dr. Adamia initially called to consult NCL's contracted shoreside consultant service with the Cleveland Clinic of Florida during the afternoon of November 10, 2019.  Dr. Adamia reported that Bradbury fell two days ago and on the morning of November 10, 2019 became confused such that she "even can not remember name of Spouse" and "not realizes where she is".  Despite these symptoms, Dr. Adamia reported that Bradbury had "no signs of neurologicacl deficit" "[g]enerally looks well, complains just on mild headache".  Dr. Adamia also failed to note that Bradbury developed a large goose egg bump on the back of her head.

39.     After being in the medical center for hours, NCL's medical personnel told Kus that they did not have the proper equipment to treat Bradbury and needed to get her off the ship.

40.     Despite, Bradbury's emergent and critical condition, NCL failed to immediately divert the ship, make immediate plans for a medical evacuation or take any action. Instead, Bradbury was forced to remain onboard for hours despite showing obvious signs of a severe emergency.

41.     Only by the evening of November 10, 2019 did NCL and its medical personnel decide to proceed with an "emergency medical evacuation".  NCL and the medical personnel planned to stay on course and simply "speed up the ship" and arrive in St. Thomas about 10 p.m. on November 11, 2019 instead of the morning of November 12, 2019.

42.     Bradbury arrived at a hospital over 36 hours from the time Kus noticed that Bradbury could not answer basic questions.

43.     NCL arranged for and controlled when and how to medically evacuate Bradbury. NCL knew approximately how long it would take before Bradbury would be taken to for treatment.

NCL also knew or could have called the hospital in St. Thomas to determine its limitations in its ability to care and treat Bradbury.

44.     NCL also knew that it had multiple options to expedite medically evacuating Bradbury such as diverting the ship's course to several different islands but chose not to do so. Out of all of the options available to NCL, NCL chose the slowest option to medically evacuate Bradbury.  NCL chose to do so in order to avoid port charges, increased fueling costs and/or the loss of revenue generated from all of the preplanned excursions sold by NCL to the other thousands of passengers onboard the ship.

45.     As a result, Bradbury arrived at a hospital in St. Thomas that was not capable of handling Bradbury's medical emergency.  Bradbury was emergently flown to Jackson Memorial Hospital in Miami, Florida.  The hospital's medical team was playing "catch up" due to the misdiagnosis and significant delays in providing the emergency care and treatment Bradbury needed to prevent and/or minimize damage to her brain.

### PLAINTIFF'S INJURIES AND DAMAGES

46.     As a result Defendants' negligence, Bradbury suffered significant and permanent injuries.

47.     NCL, Dr. Adamia, Dr. Perrilliat Nava, and NCL's medical personnel misdiagnosed, mismanaged, and improperly monitored Bradbury's injuries. Those acts, along with Defendants' failure to timely disembark, call for and arrange from an ambulance and/or medically evacuate her from the ship, and the unreasonable delays in transporting her for shoreside medical treatment, caused Bradbury to suffer severe and permanent damage to her brain.

48.     Had NCL, NCL's medical personnel, and the Defendant Doctors appropriately diagnosed and managed Bradbury's medical emergency, and/or timely medically disembarked and/or evacuated Bradbury off NCL's ship, she would have arrived at a medical facility in time to

receive medical care and treatment that would have dramatically changed the outcome of her medical condition and/or prognosis.

49.    As a result of Defendants' negligence, Bradbury suffered a traumatic brain injury, an intracerebral and subdural hematoma (left side), intraparenchymal and subarachnoid hemorrhage within the left frontal lobe, a left to right midline shift, as well as an acute displaced oblique fracture of the distal right fibula (right leg). Bradbury also suffered other serious complications that could have been prevented with a proper timely diagnosis, monitoring, medical evacuation, and/or transport for treatment within the window of time during which she could have received treatments and/or procedures to address what was a treatable condition.

50.    **DAMAGES.** Plaintiff has incurred damages in the past and will continue to incur damages in the future, including:

a.  Plaintiff has incurred economic damages in the past and is reasonably certain to continue incurring economic damages into the future. Burgess has paid and will continue to pay significant medical expenses and costs of care. Plaintiff's economic damages include, but are not limited to, medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity in the future.

b.  Plaintiff also has incurred non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

51.    **PRIOR SIMILAR INCIDENTS**: NCL knew or should have known about the dangers posed to passengers when its shipboard medical personnel provide negligent medical treatment and/or fail to timely disembark seriously injured or ill passengers for emergency

shoreside medical care. NCL's knowledge is based on several prior similar incidents, including but not limited to the following:

a. **Manuel Asuncion Oro**: Case No. 1:19-cv-20964 (S.D. Fla.) involved an elderly passenger who fell during a shore excursion. NCL diagnosed Oro with a fractured rib. Oro's condition progressed and Oro's physical condition deteriorated and he struggled to breathe. NCL continued to turn Oro away claiming that no further care was required. However, upon return to Miami, Florida Oro was admitted to a local ICU to treat his severe and permanent injuries.

b. **Harris Colon**: Case No. 1:18-cv-24883 (S.D. Fla.) involved Colon who presented to NCL's medical center in acute distress. NCL's medical personnel improperly diagnosed and discharged Colon despite having unstable blood pressure, blood sugar and kidney function. Colon returned to his cabin and started vomiting. The medical center told Colon that it was good he was throwing up and to return to the infirmary in the morning. Relying on NCL's medical personnel, Colon waited. However, the next day Colon developed septic shock and multisystem organ failure. NCL's shipboard doctors who failed to timely recognized Arroyos' progressive medical condition and failed to timely disembark and/or medically evacuate Colon.

c. **Andre Ow Buland**: Case No. 17-cv-24167 (S.D. Fla.) Ow Buland suffered a heart attack on NCL's ship. NCL's medical personnel chose to keep the vessel on course and keep Ow Buland on the ship for two days after his heart attack instead of medically evacuating him. As a result of NCL's untimely medical evacuation of Ow Buland and failure to recognize the need for advanced continued care that NCL and NCL's medical personnel could not provide, Ow Buland suffered severe and permanent injuries

d. **K.A.B. (deceased minor), K.B. and B.B. (minors)**: Case No. 1-16-cv-21446 (S.D. Fla.) NCL's shipboard doctors and/or medical staff failed to timely and/or properly provide medical care and/or treatment to three minor children, one of whom drowned and the other two

minors who nearly drowned.  NCL's medical personnel took an unreasonably long amount of time to respond to a medical emergency and the Defendants did not have the necessary medical equipment to save the decedent child's life.

e. **Ana Maria Arroyos**: Case No. 1:16-cv-20926-MGC (S.D. Fla.), involved NCL's shipboard doctors who failed to timely recognized Arroyos' progressive medical condition and failed to timely disembark and/or medically evacuate Arroyos which resulted in severe and permanent injuries.

f. **William Cordani**: Case No. 1:15-cv-23414 (S.D. Fla.) NCL's doctors failed to timely recognize Cordani's progressive and rapidly deteriorating condition and failed to timely disembark and/or medically evacuate Cordani, which resulted in his death.

g. **Mildred Ridley**:  Case No. 10-cv-22711 (S.D. Fla.)  NCL's crew found Ridley collapsed on the floor in a passageway and took her to the ship's medical center.  NCL improperly diagnosed and provided minimal treatment for pneumonia.  Ridley's condition progress and deteriorated.  By the time Ridley was suffering from respiratory failure, she was medically evacuated by the U.S. Coast Guard to a hospital in the Florida Keys.  NCL's  failure to timely recognize and diagnose Ridley's progressive medical condition and failure to timely disembark and/or medically evacuate Ridley caused her death.

**FACTS SHOWING DR. AMADIA, DR. PERRILLIAT NAVA, AND THE SHIPBOARD MEDICAL PERSONNEL WERE EMPLOYEES AND/OR ACTUAL AGENTS OF NCL**

52.     NCL is vicariously liable and responsible for the negligent acts of its shipboard medical personnel to the extent that those persons were NCL's employees and/or actual agents.

53.     Upon information and belief Dr. Adamia served as NCL's employee, pursuant to an employment agreement.  Dr. Adamia's agreement with NCL reflects an employer-employee relationship, such as "seafarer," "crew member," and/or "employee," while referring to NCL as the "employer."

54.     Upon information and belief Dr. Perrilliat Nava served as NCL's employee, pursuant to an employment agreement.  Dr. Perrilliat Nava's agreement with NCL reflects an employer-employee relationship, such as "seafarer," "crew member," and "employee," while referring to NCL as the "employer."

55.     Upon information and belief, the rest of the medical staff aboard the subject ship—including Nurse Jefred Amada, Nurse Thiago Machado, and Nurse Sofia Marjanski,—also worked pursuant to similar employment agreements.

56.     NCL employed the Defendant Doctors and the medical staff aboard the subject ship to provide medical and emergency medical treatment to its crew and passengers. At all times material to this action, the Defendant Doctors and shipboard medical staff were acting within the scope of their employment with NCL.

57.     NCL, as principal, acknowledged that the Defendant Doctors and its shipboard medical personnel would act for its benefit and on its behalf. The Defendant Doctors and shipboard medical personnel, as agents, manifested their acceptance of that undertaking. NCL's acknowledgement and the agents' acceptance are evidenced by, *inter alia*:

a.   Upon information and belief the employment agreements refer to NCL as the "employer" and refers to each of the Defendant Doctors and/or nurses as a "seafarer," "crew member," and "employee";

b.   NCL provided the Defendant Doctors and medical personnel with uniforms bearing NCL's name, logo and nametags identical to all other NCL crew member's nametags:








c.   NCL referred to its shipboard doctors and medical personnel in proprietary language—such as "our doctors"—in its marketing materials;

d.   NCL directly paid the Defendant Doctors and its medical personnel for their work in the subject ship's medical center.

58.   NCL exercised control over the actions of the Defendant Doctors and its shipboard medical personnel. That control is evidenced by, *inter alia*:

a.   The Defendant Doctors and medical personnel were NCL's employees;

b.   NCL hired the Defendant Doctors and medical personnel to work in a medical facility that was owned and operated by NCL;

c.   The Defendant Doctors and medical personnel were paid directly by NCL;

d.   Upon information and belief the Defendant Doctors and medical personnel were considered to be "seafarers," "crewmembers," and "employees," as evidenced by their employment agreements;

e.  The Defendant Doctors and medical personnel were required to wear uniforms furnished by NCL (See paragraph 57(b);

f.  NCL dictates the hours of operation for its shipboard medical centers;

g.  NCL requires its shipboard doctors and medical personnel to be on-call 24 hours a day during cruises;

h.  NCL paid the Defendant Doctors' and medical personnel's salaries;

i.  Upon information and belief the Defendant Doctors' and/or medical personnel employment agreements provided that any medical records generated in the course of employment by the doctor/physician shall be owned by the Employer/Cruise Line.

j.  NCL controlled the pricing of services provided in the shipboard medical center;

k.  Passengers treated by the Defendant Doctors and medical personnel were billed directly by NCL and not by the Defendant Doctors or shipboard medical personnel;

l.  NCL pays to stock the medical centers with all supplies, medications, and equipment necessary for the Defendant Doctors and medical personnel to treat passengers in the ship's medical center;

m.  NCL maintained the right to fire the Defendant Doctors and its medical personnel.

59.  Accordingly, the Defendant Doctors and shipboard medical personnel were NCL's actual agents. *See Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1236-1237 (11th Cir. 2014).

**FACTS SHOWING THAT DR. AMADIA, DR. PERRILLIAT NAVA, AND THE SHIPBOARD MEDICAL PERSONNEL WERE THE APPARENT AGENTS OF NCL**

60.  NCL is vicariously liable and responsible for the negligent acts of its shipboard medical personnel to the extent that those persons were NCL's apparent agents.

61.  NCL made a number of relevant representations to the general public and its passengers, including Plaintiff, such as:

     a.   NCL referred to its shipboard doctors in proprietary language, calling them "our doctors," in its marketing materials;

     b.   NCL referred to its shipboard medical facilities in proprietary language, referring to them as "our medical facilities," in its marketing materials;

     c.   NCL provided the Defendant Doctors and medical personnel with uniforms bearing NCL's name, logo and name tags like other NCL crew members:








  d. NCL billed passengers, including Plaintiff, directly for services provided in its shipboard medical center;

  e. NCL offered its passengers a "BookSafe Platinum Travel Protection" for reimbursement of medical expenses incurred aboard its ships.

  62. Based on those representations, Plaintiff reasonably believed that the Defendant Doctors and shipboard medical personnel were authorized to render medical services for NCL's benefit. NCL encouraged that belief among its passengers by using the ship's medical center as a marketing tool to induce passengers to cruise aboard NCL ships. Toward that end, NCL represented in its marketing materials that every ship in its fleet has a medical facility staffed with doctors and nurses.

  63. NCL's representations induced Plaintiff to detrimentally and justifiably rely upon the appearance of an agency relationship between NCL, as principal, and the Defendant Doctors and shipboard medical personnel, as agents. That detrimental, justifiable reliance is evidenced by, *inter alia*:

a.  Plaintiff followed the advice of the Defendant Doctors and shipboard medical personnel by not requesting that he be immediately evacuated off the ship for imaging and treatment;

b.  Plaintiff would not have blindly trusted the advice of unknown medical personnel if the Defendant Doctors and shipboard medical personnel had not borne the imprimatur of a well-known and trusted cruise line, NCL;

c.  Plaintiff would not have followed the advice of the Defendant Doctors and shipboard medical personnel had he suspected that they were not actually NCL's agents.

64.  Accordingly, the Defendant Doctors and shipboard medical personnel were NCL's apparent agents. *See Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1251-53 (11th Cir. 2014).

<u>**COUNT I:**</u>

**NEGLIGENT MEDICAL TREATMENT – VICARIOUS LIABILITY OF CRUISE LINE:**
**ACTUAL AGENCY/RESPONDEAT SUPERIOR**

65.  Plaintiff hereby adopts and re-alleges the allegations in paragraphs 1 through 64 above, as if set forth entirely herein.

66.  This count seeks to hold NCL vicariously liable, under principles of respondeat superior and actual agency, for the negligence of Dr. Adamia, Dr. Perrilliat Nava and other shipboard medical personnel in connection with the Medical Emergency that occurred on November 10, 2019.

67.  At all times material to this action, NCL, as well as its employees and/or actual agents, owed Plaintiff a duty to exercise reasonable care under the circumstances. That duty of care included the duty to provide Plaintiff with prompt and appropriate medical care for the head injury Bradbury sustained aboard the subject ship on November 8, 2019.

68.     Dr. Adamia, Dr. Perrilliat Nava and NCL's shipboard medical personnel were the employees and/or actual agents of NCL, as alleged in paragraphs 52 through 59 above.

69.     Dr. Adamia, Dr. Perriliat Nava and NCL's shipboard medical personnel breached their duty of care by failing to administer the medical care and treatment that was necessary, reasonable, and which complied with the standard of care. Those breaches include, *inter alia*:

a.   Failing to properly assess, diagnose, monitor and/or follow Plaintiff's head injury;

b.   Failing to provide any further care, treatment, and/or follow up evaluations of Bradbury's head injury, despite the significant trauma to her head;

c.   Failing to recognize and/or appreciate the gravity and time-sensitive nature of Bradbury's progressive condition;

d.   Failing to accurately describe, characterize, and/or advise NCL's shoreside on-call physician, captain, staff captain, officers and/or the NCL personnel who assist, approve and/or participate in the treatment and care of passenger patients such as Bradbury;

e.   Failing to prescribe that Bradbury be immediately evacuated off of the subject ship and transported to a shoreside medical facility to undergo radiological studies (such as a CT scan or MRI) to determine whether she was suffering from any subdural injury, such as bleeding on or around her brain;

f.   Failing to prescribe that Bradbury be immediately evacuated off of the subject ship and transported to a shoreside medical facility capable of providing necessary treatment and/or medications that were not available aboard the subject ship;

g.   Failing to adequately investigate the circumstances and extent of Bradbury's injury, including failing to ask either Bradbury or Kus whether Bradbury had lost consciousness after the fall that caused the "goose egg" bump to develop on her head.

70.     Instead of rendering appropriate care, advising Bradbury on the proper care for a head injury, and/or ordering her timely evacuation off of the ship, NCL delayed in diagnosing Bradbury and/or selected the slowest method to medically evacuate Bradbury from the ship.

71.     As a direct and proximate result of the negligence of Dr. Adamia, Dr. Perrilliat Nava and the ship's medical personnel, Bradbury suffered severe and permanent injuries. Specifically, Plaintiff's severe internal head injuries went undiagnosed, undetected, and untreated, which resulted in Plaintiff suffering multiple suffering severe and permanent injuries.

72.      As a direct and proximate result of NCL's negligence, Plaintiff has suffered damages in the past that will continue into the future.

73.     **DAMAGES**: NCL's negligence proximately caused permanent injuries and damages to the Plaintiff in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE the Plaintiff demands Judgment against NCL for damages  recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due

under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

**COUNT II:**

**NEGLIGENT MEDICAL TREATMENT – VICARIOUS LIABILITY OF CRUISE LINE: APPARENT AGENCY/AGENCY BY ESTOPPEL**

74.     Plaintiff hereby adopts and re-alleges the allegations in paragraphs 1 through 51, and paragraphs 60 through 64 above, as if set forth entirely herein.

75.     This count seeks to hold NCL vicariously liable, under principles of apparent agency, for the negligence of Dr. Adamia, Dr. Perrilliat Nava and other shipboard medical personnel in connection with the Plaintiff's medical emergency. It is asserted *in the alternative to Count I*, which seeks to hold NCL vicariously liable under principles of respondeat superior and actual agency.

76.     At all times material to this action, NCL, as well as its apparent agents, owed Plaintiff a duty to exercise reasonable care under the circumstances. That duty of care included the duty to provide Plaintiff with prompt and appropriate medical care for the head injury Burgess sustained aboard the subject ship.

77.     Dr. Adamia, Dr.Perrilliat Nava and NCL's shipboard medical personnel were the apparent agents of NCL, as alleged in paragraphs 60 through 64 above.

78.     Dr. Adamia, Dr. Perrilliat Nava and NCL's shipboard medical personnel breached their duty of care by failing to administer the medical care and treatment that was necessary, reasonable, and which complied with the standard of care. Those breaches include, *inter alia*:

a.  Failing to properly assess, diagnose, monitor and/or follow Plaintiff's head injury;

b.  Failing to provide any further care, treatment, and/or follow up evaluations of Bradbury's head injury, despite the significant trauma to the back of her head;

c.   Failing to recognize and/or appreciate the gravity and time-sensitive nature of Bradbury's progressive condition;

d.   Failing to accurately describe, characterize and/or advise NCL's shoreside on-call physician, captain, staff captain, officers, and/or the NCL personnel who assist, approve and/or participate in the treatment and care of passenger patients such as Bradbury;

e.   Failing to accurately describe, characterize and/or advise NCL's shoreside on-call physician, captain, staff captain, officers and/or the NCL personnel who assist, approve and/or participate in medically evacuating passenger patients such as Bradbury;

f.   Failing to prescribe that Bradbury be immediately evacuated off of the subject ship and transported to a shoreside medical facility to undergo radiological studies (such as a CT scan or MRI) to determine whether she was suffering from any subdural injury, such as bleeding on or around her brain;

g.   Failing to prescribe that Bradbury be immediately evacuated off of the subject ship and transported to a shoreside medical facility capable of providing necessary treatment and/or medications that were not available aboard the subject ship;

h.   Failing to adequately investigate the circumstances and extent of Bradbury's injury, including failing to ask either Bradbury or Kus whether Bradbury had lost consciousness after the fall that caused injuries to Bradbury's head.

79.   Instead of rendering appropriate care, advising Bradbury on the proper care for a head injury, and/or ordering her timely evacuation off of the ship, NCL delayed in diagnosing Bradbury and/or selected the slowest method to medically evacuate Bradbury from the ship.

80.   As a direct and proximate result of the negligence of Dr. Adamia, Dr. Perrilliat Nava and the ship's medical personnel, Bradbury suffered severe and permanent injuries.

24

Specifically, Plaintiff's severe internal head injuries went undiagnosed, undetected, and untreated, which resulted in Plaintiff suffering severe and permanent injuries.

81.     As a direct and proximate result of NCL's negligence, Plaintiff has suffered damages in the past that will continue into the future.

82.     **DAMAGES**: NCL's negligence proximately caused permanent injuries and damages to the Plaintiff in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE the Plaintiff demands Judgment against NCL for damages  recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

## COUNT III:

### NEGLIGENT MEDICAL CARE – DIRECT LIABILITY OF
### DOCTOR MICHIEL GIA ADAMIA

83.     Plaintiff hereby adopts and re-alleges the allegations in paragraphs 1 through 51 above as if set forth entirely herein.

84.     This count seeks to hold Dr. Adamia directly liable for his negligence in connection with the medical emergency that occurred on November 8 and 10, 2019.

85.     At all times material to this action, Dr. Adamia owed Plaintiff a duty to exercise reasonable care under the circumstances. That duty of care included the duty to provide Plaintiff medical services in accordance with a level of care and skill that is recognized as acceptable and appropriate by reasonably prudent healthcare providers under the same or similar circumstances.

86.     Dr. Adamia breached his duty of care by failing to administer the medical care and treatment that was necessary, reasonable, and which complied with the standard of care. Those breaches include, *inter alia*:

    a.   Failing to properly assess, diagnose, monitor, and/or follow Plaintiff's head injury;

    b.   Failing to provide any further care, treatment, and/or follow up evaluations of Bradbury's head injury, despite the significant trauma to the back of her head;

    c.   Failing to recognize and/or appreciate the gravity and time-sensitive nature of Bradbury's progressive condition;

    d.   Failing to accurately describe, characterize, and/or advise NCL's shoreside on-call physician, captain, staff captain, officers, and/or the NCL personnel who assist, approve and/or participate in the treatment and care of passenger patients such as Bradbury;

    e.   Failing to prescribe that Bradbury be immediately evacuated off of the subject ship and transported to a shoreside medical facility to undergo radiological studies (such as a CT scan

or MRI) to determine whether she was suffering from any subdural injury, such as bleeding on or around his brain;

      f.   Failing to prescribe that Bradbury be immediately evacuated off of the subject ship and transported to a shoreside medical facility capable of providing necessary treatment and/or medications that were not available aboard the subject ship;

      g.   Failing to adequately investigate the circumstances and extent of Bradbury's injury, including failing to ask either Bradbury or Kus whether Bradbury had lost consciousness after the fall that caused her head injuries.

87.     As a direct and proximate result of the negligence of Dr. Adamia, Bradbury suffered severe and permanent injuries. Specifically, Plaintiff's severe internal head injuries went undiagnosed, undetected, and untreated, which resulted in Plaintiff suffering severe and permanent injuries.

88.     As a direct and proximate result of the negligence of Dr. Adamia, Plaintiff has suffered damages in the past that will continue into the future.

89.     **DAMAGES**: NCL's negligence proximately caused permanent injuries and damages to the Plaintiff in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE the Plaintiff demands Judgment against NCL for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

## COUNT IV:

### NEGLIGENT MEDICAL CARE – DIRECT LIABILITY OF
### DOCTOR MICHIEL FRANCISCO PERRILLIAT NAVA

90.     Plaintiff hereby adopts and re-alleges the allegations in paragraphs 1 through 51 above as if set forth entirely herein.

91.     This count seeks to hold Dr. Perrilliat Nava directly liable for his negligence in connection with the medical emergency that occurred on November 8 and 10, 2019.

92.     At all times material to this action, Dr. Perilliat Nava owed Plaintiff a duty to exercise reasonable care under the circumstances. That duty of care included the duty to provide Plaintiff medical services in accordance with a level of care and skill that is recognized as acceptable and appropriate by reasonably prudent healthcare providers under the same or similar circumstances.

93.     Dr. Perrilliat Nava breached his duty of care by failing to administer the medical care and treatment that was necessary, reasonable, and which complied with the standard of care. Those breaches include, *inter alia*:

        a.   Failing to properly assess, diagnose, monitor, and/or follow Plaintiff's head injury;

b.   Failing to provide any further care, treatment, and/or follow up evaluations of Bradbury's head injury, despite the significant trauma to the back of her head;

c.   Failing to recognize and/or appreciate the gravity and time-sensitive nature of Bradbury's progressive condition;

d.   Failing to accurately describe, characterize, and/or advise NCL's shoreside on-call physician, captain, staff captain, officers, and/or the NCL personnel who assist, approve and/or participate in the treatment and care of passenger patients such as Bradbury;

e.   Failing to prescribe that Bradbury be immediately evacuated off of the subject ship and transported to a shoreside medical facility to undergo radiological studies (such as a CT scan or MRI) to determine whether she was suffering from any subdural injury, such as bleeding on or around his brain;

f.   Failing to prescribe that Bradbury be immediately evacuated off of the subject ship and transported to a shoreside medical facility capable of providing necessary treatment and/or medications that were not available aboard the subject ship;

g.   Failing to adequately investigate the circumstances and extent of Bradbury's injury, including failing to ask either Bradbury or Kus whether Bradbury had lost consciousness after the fall that caused her head injuries.

94.   As a direct and proximate result of the negligence of Dr. Perrilliat Nava, Bradbury suffered severe and permanent injuries. Specifically, Plaintiff's severe internal head injuries went undiagnosed, undetected, and untreated, which resulted in Plaintiff suffering severe and permanent injuries.

95.   As a direct and proximate result of the negligence of Dr. Perrilliat Nava, Plaintiff has suffered damages in the past that will continue into the future.

96.   **DAMAGES**: NCL's negligence proximately caused permanent injuries and damages to the Plaintiff in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE the Plaintiff demands Judgment against NCL for damages  recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

## COUNT V:
### NEGLIGENT FAILURE TO EVACUATE PASSENGER AND/OR EVACUATE PASSENGER APPROPRIATELY – DIRECT LIABILITY OF THE CRUISE LINE

97.   Plaintiff hereby adopts and re-alleges the allegations in paragraphs 1 through 51 above as if set forth entirely herein.

98.   This Count seeks to hold NCL directly liable for its negligence in failing to timely evacuate Plaintiff off of its cruise ship.

99.     At all times material to this action, NCL, as well as its employees, agents, and/or apparent agents, owed Plaintiff a duty to exercise reasonable care under the circumstances. That duty of care included the duty to provide Plaintiff with prompt and appropriate medical care for her head injury he sustained aboard the subject ship.

100.     NCL knew or should have known that Plaintiff's head injury was severe, time-sensitive and progressive in nature. NCL was advised of Plaintiff's severe condition through Dr. Adamia, Dr. Perrilliat and/or NCL's medical personnel who called and emailed NCL and/or NCL's on-call shoreside physicians and medical personnel to advise them of same.  Once NCL learned of the severity of Plaintiff's condition it should have taken measures to evacuate her off of the ship and/or divert the ship's course to secure prompt, appropriate medical care that would have prevented the devastating injuries she ultimately suffered.

101.     NCL, acting through the commanding officers aboard the subject ship and NCL's shoreside medical team, breached its duty of care by, *inter alia*:

        a.  Failing to make the arrangements necessary to have Bradbury immediately evacuated off of the subject ship, and transported to a shoreside medical facility capable of providing necessary treatment, diagnostic imaging, and/or medications that were not available aboard the subject ship;

        b.  Failing to divert the course of the subject ship to ensure that it was in port sooner so that Plaintiff could be taken to a shoreside medical facility capable of providing necessary treatment, diagnostic imaging, and/or medications that were not available aboard the subject ship;

        c.  Failing to advise Plaintiff that such an evacuation or course diversion was available and necessary in order for her to receive adequate medical treatment for her head injury.

102.    As a direct and proximate result of NCL's negligence, Bradbury suffered severe and permanent injuries. Specifically, Plaintiff's severe internal head injuries went undiagnosed, undetected, and untreated, which resulted in Plaintiff suffering severe and permanent injuries.

103.    As a direct and proximate result of NCL's negligence, Plaintiff has suffered damages in the past that will continue into the future.

104.    **DAMAGES**: NCL's negligence proximately caused permanent injuries and damages to the Plaintiff in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE the Plaintiff demands Judgment against NCL for damages  recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

## COUNT VI:

### NEGLIGENT HIRING AND SELECTION OF ONBOARD MEDICAL STAFF – DIRECT LIABILITY OF THE CRUISE LINE

105.     Plaintiff hereby adopts and re-alleges the allegations in paragraphs 1 through 51 above as if set forth entirely herein.

106.     This Count seeks to hold NCL directly liable for negligently hiring and/or selecting Dr. Adamia and Dr. Perrilliat Nava to serve as shipboard physicians on the subject cruise during which they provided negligent medical care to Plaintiff.

107.     At all times material to this action, NCL owed Plaintiff a duty to exercise reasonable care under the circumstances. NCL's duty includes the duty to staff its shipboard medical centers with competent doctors, nurses, and medical personnel.

108.     To comply with its duty of reasonable care, NCL was required to make an appropriate investigation into the qualifications and background of its shipboard doctors, nurses, and medical personnel to ensure that they were competent and fit to perform their duties in the medical centers aboard NCL's ships *before* hiring and/or selecting doctors to work on NCL's ships. Such investigation should have included, *inter alia*:

a.   contacting medical boards or equivalent medical regulatory bodies, medical schools, and/or medical facilities where the Defendant Doctors had previously practiced, studied, and/or worked;

b.   contacting other cruise lines that had previously employed and/or contracted with the Defendant Doctors;

c.   inquiring of the Defendant Doctors, prior to hiring them, about their experience and training in the field of emergency medicine and obtaining proof of their qualifications and competence to practice emergency medicine.

d.   Adequately and/or reasonably testing the Defendant Doctors before hiring them to test their education, training, experience and competence to practice emergency medicine.

109.   NCL failed to conduct an appropriate investigation into the qualifications and background of its shipboard doctors, nurses, and medical personnel to ensure that they were competent and fit to perform their duties in the medical centers aboard NCL's ships *before* hiring and/or selecting doctors to work on NCL's ships.  Had NCL conducted such an investigation then NCL would have known that NCL's Doctors were incompetent or unfit to practice emergency medicine on NCL's ships.

110.   NCL breached its duty by hiring the Defendant Doctors when it knew or should have known that they were incompetent or unfit.

111.   Accordingly, NCL knew or should have known that the Defendant Doctors were incompetent or unfit to perform their duties when they were hired  to serve as a shipboard physicians on the subject cruise during which he provided negligent medical care to Plaintiff Bradbury.

112.   The incompetence or unfitness of the Defendant proximately caused Plaintiff's injuries. Specifically, Plaintiff's traumatic brain injury and injuries went untreated for days. As a result of the negligent treatment and significant delays, Plaintiff's condition continued to deteriorate.  Had NCL timely disembarked and/or evacuated Bradbury for appropriate care and/or treatment it would have prevented or drastically reduced the severity of her injuries.

113.   As a direct and proximate result of NCL's negligent hiring and selection of the Defendant Doctors, Plaintiff has suffered damages in the past that will continue into the future.

114.   **DAMAGES**: NCL's negligence proximately caused permanent injuries and damages to the Plaintiff in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the

past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE the Plaintiff demands Judgment against NCL for damages  recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

## COUNT X:

## NEGLIGENT PROVISIONING AND EQUIPPING OF MEDICAL FACILITY – DIRECT LIABILITY OF THE CRUISE LINE

115.    Plaintiff hereby adopts and re-alleges the allegations in paragraphs 1 through 51 above as if set forth entirely herein.

116.    This Count seeks to hold NCL directly liable for negligently provisioning and equipping the medical facility aboard the NCL *Gem*, where Plaintiff received medical treatment during the subject cruise.

117.    At all times material to this action, NCL owed Plaintiff a duty to exercise reasonable care under the circumstances. That included the duty to properly staff the ship's medical facilities,

to provide the appropriate resources to the medical staff, and to provide reasonable and appropriate equipment, supplies, and medications for the ship's medical facility.

118.    NCL breached its duty of reasonable care by, *inter alia*:

a.    Failing to supply its shipboard medical center with adequate diagnostic testing equipment, including CT scans and/or MRIs, to enable its physicians and medical staff to properly diagnose, treat, and care for its passengers;

b.    Failing to supply its shipboard medical center with adequate medications to enable its physicians and medical staff to properly diagnose, treat, and care for its passengers;

c.    Failing to supply its shipboard medical center with necessary manuals, treatises, and reasonable procedures for contacting medical professionals in the United States for consultation about the care and treatment of significant emergency medical conditions afflicting its passengers, including Plaintiff;

d.    Failing to staff its shipboard medical center with competent and qualified doctors and medical staff capable of diagnosing, treating, and caring for its passengers, particularly those suffering from significant emergency medical conditions, such as Plaintiff.

119.    NCL's breaches are aggravated by the fact that it knew that its shipboard medical center was the only source of medical care for its thousands of passengers sailing aboard the subject cruise, and it knew that the ship would be sailing for significant periods of time hundreds of miles from shore-based hospitals, and off the shores of underdeveloped countries offering sub-standard medical care.

120.    As a direct and proximate result of NCL's negligence, Plaintiff suffered severe and permanent injuries.

a. Due to NCL's negligent provisioning and equipping of its shipboard medical center on November 10, 2019, Plaintiff's severe internal head injuries went undiagnosed, undetected, and untreated, which resulted in Plaintiff suffering severe and permanent injuries.

b. Accordingly, Plaintiff's condition was allowed to deteriorate during a critical period when she should have been receiving medications and/or interventional treatments that would have prevented or drastically reduced the severity of her injuries.

121. As a direct and proximate result of NCL negligence, Plaintiff has suffered damages in the past that will continue into the future.

122. **DAMAGES**: NCL's negligence proximately caused permanent injuries and damages to the Plaintiff in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE the Plaintiff demands Judgment against NCL for damages  recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due

under the applicable law including interest from the date of the subject incident under General

Maritime Law, and any and all other damages which the Court deems just or appropriate.

By: ____/s/John H. Hickey_____
       **JOHN H. HICKEY (FBN 305081)**
       Email: hickey@hickeylawfirm.com
       **SARAH A. LOBEL, ESQ. (FBN 88716)**
       Email:  slobel@hickeylawfirm.com
       **HICKEY LAW FIRM, P.A.**
       1401 Brickell Avenue, Ste. 510
       Miami, Florida 33131-3504
       Telephone: (305) 371-8000
       Facsimile: (305) 371-3542